### SKINNER'S WILL.

[62 Pac. 523, 67 Pac. 951.]

TIME OF APPEALING—EXCEPTING TO SURETIES.

1. Section 541 of Hill's Ann. Laws*, requiring the transcript on appeal to be filed within thirty days from the expiration of the time allowed to object to the sureties on the undertaking, is complied with by filing the transcript within the required time from the justification of the sureties after being excepted by some of the respondents.   An objection by one respondent serves to extend the time of the appellant as to all the respondents.

IDENTIFICATION OF EVIDENCE—CERTIFICATE REQUIRED.

2. Where an appeal from the county court to the circuit court is tried in the latter court on testimony given in the former, the evidence is sufficiently identified on appeal to the supreme court by the certificate of the county judge, and does not need the additional certificate of the circuit judge.

SUBSTITUTION OF PERSONAL REPRESENTATIVE—NOTICE.

3. Unless specially required by a statute or a rule of court notice need not be given of a motion to substitute a personal representative for a deceased party to a pending cause.   See sections 38 and 524 of Hill's Ann. Laws.

RIGHT TO ABANDON APPEAL AND PERFECT A NEW ONE.

4. Where exceptions are taken to the sureties on an appeal bond, the appellant is not required to produce the sureties for justification, but may abandon the appeal and take a new one: *Van Auken* v. *Dammeier,* 27 Or. 150, followed.

---

*NOTE.—The citation here given is to the statute as amended by Laws, 1899, pp. 227, 229.—REPORTER.

APPEAL—FILING BOND AFTER EXPIRATION OF TIME.

5. Under Hill's Ann. Laws, § 537, subd. 4, authorizing the court to permit an appellant to perform any omitted act necessary to perfect an appeal where the notice has been given in good faith, the circuit court may allow a new undertaking where the sureties have not been able to justify on the original, and the time for filing the bond has expired.

RULES—AMENDING ABSTRACT BY ASSIGNING ERRORS.

6. Where an appellant, through mistake or inadvertence, has failed to print an assignment of errors in his abstract, as required by Rule 9 of the court (35 Or. 587, 598), he may supply the omission if a proper showing is made: *Fleischner* v. *Bank of McMinnville*, 36 Or. 553, applied.

APPEAL—PRACTICE AS TO FILING NEW UNDERTAKING.

7. Where confusion and irregularity concerning the undertaking on appeal have been caused by the death of appellant and objections to the sureties on the appeal bond, the preferable practice is for the substituted appellant to tender a new undertaking, and it will be accepted in place of the first one.

WILL—TESTAMENTARY CAPACITY.

8. A testator, when executing his will, was impaired in health and confined to his room, but able to dress himself and go to his meals. On the death of the chief beneficiary under a former will, he discussed with his neighbors and his lawyer the advisability of making another, and sent for the latter to draw a new will. The testator had made memoranda of several gifts, and discussed with the lawyer in detail the proposed gifts, giving intelligent reasons for the provisions he desired. The lawyer was of the opinion that he possessed testamentary capacity. He intelligently transacted other business at the time of making the will. His neighbors, intimate acquaintances, testified that the testator was peculiar, but transacted his own business and exhibited a singular shrewdness which was characteristic of him. Contestant's witnesses believed him incompetent to dispose of his property, but related particular transactions which gave indications of his good sense. On two or three occasions the testator had aimlessly wandered about in a dazed condition, but these were of short duration and apparently caused by temporary physical ailments. A codicil to the will was executed under similar circumstances, except that he had grown physically weaker. *Held*, on a contest of the will and codicil, that the evidence did not show testamentary incapacity: *Chrisman* v. *Chrisman*, 16 Or. 127, cited.

INSANE DELUSION EXPLAINED.

9. Where a testator, believing and acting upon neighborhood gossip, thought that his daughter-in-law would take measures to possess herself of his property, he was not possessed of an insane delusion which would invalidate his will, since the idea had its basis in an external fact, viz., the statements made by others, although they were untrue: *Potter* v. *Jones*, 20 Or. 239, 249, cited.

NECESSITY OF PUBLISHING THE PAPER AS A WILL.

10. Under Hill's Ann. Laws, § 3069, prescribing that a will or codicil shall be in writing, signed by the testator and attested by two competent witnesses subscribing their names in the presence of the testator, a will executed in proper form is valid without any publication or any statement by the testator that it is his will or codicil; it being only necessary to observe the formalities required by the statute: *Luper* v. *Werts*, 19 Or. 122, cited.

Evidence of Execution of Will.*

11. The evidence of the execution of a will and codicil showed the signature of the testator and the subscribing witnesses. One of the witnesses testified that they attested the will and codicil in the presence of the testator. the other witness did not remember that the testator had signed the will, or that he saw the witness attest it, or that he requested the witness to sign. The latter witness, at the first probate of the will, signed the usual affidavit required for making proof to common form, deposing that she saw the testator subscribe the will and codicil and that she signed as a witness at his request and in his presence. The will and codicil contained the usual attestation clause. *Held*, that there was sufficient proof of the execution; if the fact of execution is not clearly proven, it is so nearly so that the balance of necessary evidence is supplied by the presumption that the legal formalities were complied with.

Will—Manner of Requesting Witness to Sign.

12. Where an attorney drawing a will called a person to witness its execution, who signed as a witness, the assumption is warranted that this was done at testator's instance; the attesting clause reciting that the witness signed at the request of the testator, and there being no direct denial that such was the case: *Ames' Will*, 40 Or. 495, cited.

From Polk: Reuben P. Boise, Judge.

This is a proceeding originating in the county court to revoke the probate of the will of R. L. Skinner, deceased, resulting in a decree as prayed for. On appeal to the circuit court the probate was sustained, and now the objector appeals to this court. A motion to dismiss the appeal was overruled, Mr. Chief Justice Bean delivering the opinion, and the case heard in its order. The opinion on the merits was delivered by Mr. Justice Wolverton.

Motion Overruled; Affirmed.

---

*Note.—As to What Actions Will Amount to a Witnessing of a Will in the Presence of a Testator, see 8 L. R. A., p. 826; *Town of Pawtucket* v. *Ballou*, 2 Am. St. Rep. 868; *Witt* v. *Gardiner*, 49 Am. St. Rep. 150, note; *Mendell* v. *Dunbar*, 61 Am. St. Rep. 283, note; *Ex parte Leonard*, 22 L. R. A. 302; *Burney* v. *Allen*, 74 Am. St. Rep. 643, note; *Hopkins* v. *Wheeler*, 79 Am. St. Rep. 819; *Re Cunningham's Will*, 81 Am. St. Rep. 256, 51 L. R. A. 642.

Effect of Having the Will Signed for the Testator by Another Person: *Diehl* v. *Rodgers*, 47 Am. St. Rep. 908, 915; Note in 22 L. R. A. at p. 299; *Ex parte Leonard*, 22 L. R. A. 302; *Walton* v. *Kendrick*, 25 L. R. A. 701. See, also, *Re Crawford*, 32 L. R. A. 77.

As to the Effect of Having the Witnesses Sign Before the Testator Has Signed: *Marshall* v. *Mason*, 79 Am. St. Rep. 305; *Lacey* v. *Dobbs*, 55 L. R. A. 580; *Brooks* v. *Woodson*, 14 L. R. A. 160, and note; *Kaufman* v. *Caughman*, 61 Am. St. Rep. 808; *Gibson* v. *Nelson*, 72 Am. St. Rep. 254.—Reporter.

Decided 29 October, 1900.

## On Motion to Dismiss Appeal.

*Messrs. George G. Bingham* and *A. O. Condit,* for the motion.

*Mr. Webster Holmes, contra.*

Mr. Chief Justice Bean delivered the opinion.

1. Where there are several respondents, and some of them except to the sufficiency of the sureties on the undertaking for an appeal, the appeal is not to be deemed abandoned as to the other respondents, although the transcript is not filed within thirty days from the expiration of the time allowed them to except to the sureties. It will be a sufficient compliance with the statute if it is filed within thirty days from the justification of the sureties on the exceptions filed by their co-respondents.

2. Where a cause originates in the county court, and, on appeal to the circuit court is tried on the testimony given in the county court, it is not necessary, on appeal to this court, that the evidence be identified by the certificate of the circuit judge. It is enough if it is identified by the certificate of the county judge.

3. It is no valid objection to an order granting an application of an executor or administrator to be substituted in place of a deceased party that it was made on the day notice thereof was served upon the attorneys for the opposite party, as notice in such case is believed to be unnecessary, unless required by the court: Hill's Ann. Laws, §§ 38, 524.

4. Where sureties on an appeal bond are excepted to, the appellant is not bound to produce them for justification, but may abandon the attempted appeal, and take a new one: *Holladay* v. *Elliott,* 7 Or. 483; *Van Auken* v. *Dammeier,* 27 Or. 150 (40 Pac. 89).

5. Where the sureties on an undertaking for an appeal, when excepted to, attempt to justify, but fail, the circuit court may, under section 537 of the statute, allow a new undertaking to be filed.

6. Where an appellant omits to assign errors in his abstract, through mistake or inadvertence, he will be permitted to amend upon a proper showing: *Fleischner* v. *Bank of McMinville*, 36 Or. 553 (60 Pac. 603).

7. Where, after exceptions to the sufficiency of sureties on an undertaking for an appeal, the appellant dies pending their justification, and subsequently, and after the substitution of his executor or administrator, the sureties are produced and justify, after notice to the respondent, this court, on a motion to dismiss the appeal, will not assume to determine the regularity of the proceedings, but will allow the appellant to file a new undertaking here, when he indicates a willingness to do so. The motion to dismiss the appeal is denied, and appellant is allowed ten days in which to prepare and file assignments of error and a new undertaking.

MOTION OVERRULED.

Decided 22 April, 1902.

ON THE MERITS.

For appellant there was a brief over the names of *Webster* and *Frank Holmes*, with an oral argument by *Mr. William H. Holmes*.

For respondents there was a brief over the names of *Sherman, Condit & Park* and *Geo. G. Bingham*, with an oral argument by *Mr. Bingham* and *Mr. A. O. Condit*.

MR. JUSTICE WOLVERTON delivered the opinion.

What purports to be the last will and testament of R. L. Skinner, deceased, and his codicil thereto, were admitted to probate in common form, March 10, 1899, by the county court of Polk County, Oregon. Subsequently, Hiram Alonzo Skinner, a son of the deceased, petitioned the county court to revoke the probate of both instruments and to set them aside. It may be here stated that Hiram Alonzo Skinner has since died, and his widow, Rebecca A. Skinner, has been appointed

his executrix and substituted in this proceeding. The grounds now urged upon which the relief is based are want of testamentary capacity ·and insufficient attestation. Some questions of practice arising upon the pleadings and the manner in which the appeal was taken from the county court were presented; but, in view of the conclusion we have come to upon the merits, it is not essential that we take further note of them, deeming it more satisfactory that the merits be reached, and made the basis of a final disposition, than that the case should be made to ·turn upon some question merely preliminary and not decisive of the ultimate controversy. Of course, if it is absolutely essential that preliminary questions be disposed of before the merits can be considered in logical order, it would be our duty to treat of them; but otherwise they are not matters necessary to a determination of the controversy.

We will first examine as to the testamentary capacity of the decedent at the time the will was made. The contention has a two-fold aspect, in that it is insisted (1) that the decedent's mind had become so weakened and impaired by old age, physical infirmities, and other misfortunes that he was incapacitated from making a testamentary disposition of his effects; and (2) it is maintained that his mind was affected by an insane delusion, whereby he was influenced and superinduced to bestow his property upon others than his son, and hence that the will was not the conscious act of the testator. The contention is the same as to the codicil.

8. At the time of the execution of the will the testator was making his home with Caleb Hughes, in West Salem. His health being impaired, he was confined almost exclusively to his room, but able, however, to dress himself and go to his meals. He had previously spoken to Mr. Bingham, his attorney, and discussed somewhat in detail the matter of a redisposition of his property by will. We say redisposition, because he had some years prior made his will, as we may infer from the testimony, disposing of the bulk of his estate to the son of the petitioner, Hiram Alonzo Skinner, who died several

years previous to the execution of the present will. Upon the death of the beneficiary of his first will, the testator at once began to discuss with his neighbors and his attorney the advisability of making another. On the immediate occasion he sent for Mr. Bingham to draw the writing, who, responding to his request, found the testator in his room dressed; and, in anticipation of its final preparation, he had written out with his own hand upon slips of note paper memoranda of the several bequests and devises he desired to make. These were put in proper form by Mr. Bingham; and while so engaged the old gentleman discussed with him the details, and gave intelligent and satisfactory reasons for the particular disposition he was making of his effects as he went along. He knew the objects of his bounty and the relationship he bore to them; comprehended the property he had at his disposal, and directed the manner of its disposition and distribution in detail; and, in the opinion of the witness, was possessed of testamentary capacity. This was manifest, not only from the definite formulation of the different bequests, but from his general demeanor, the aptness and acuteness of his mental faculties, and from the circumstance of his transacting some business with another person touching the sale of wood to him while the will was being drawn. Many other witnesses were called, being neighbors and persons of intimate acquaintance; and the general concensus of their testimony is that while the old man was peculiar in some respects, yet that up to very shortly prior to his death he transacted his own business, and continued to exhibit that peculiar shrewdness which was characteristic of him throughout his life. A number of the contestant's witnesses signified quite clearly that in their opinion he was not competent to transact business or to dispose of his property by will; but, in almost every instance where their attention was called to particular transactions, their narratives indicate the rational demeanor of the testator. It was also shown that on two or three occasions he wandered about aimlessly, apparently in a dazed condition of mind; but these were of short

duration, and probably caused by some temporary physical ailment, which passed away as he recovered therefrom. The codicil was executed under like circumstances and conditions, and, while the decedent had grown perceptibly weaker, his mental vigor was retained, so that he was able to direct and clearly discuss the several changes he was desirous of making in his will, for all of which he gave intelligent reasons, as he passed from one to the other when the writing was being prepared. Without further discussion in detail of the evidence, it being quite voluminous, suffice it to say that from a careful reading and consideration in all of its details we are satisfied that the testator was fully capacitated to dispose of his property by will, and to execute the codicil which followed, within the decisions of this court: *Hubbard* v. *Hubbard*, 7 Or. 42; *Clark's Heirs* v. *Ellis*, 9 Or. 128; *Chrisman* v. *Chrisman*, 16 Or. 127 (18 Pac. 6, 6 Am. Prob. Rep. 156).

9. The alleged delusion which, it is insisted, induced the particular and peculiar disposition complained of, is that his son's wife had designs upon his property, and proposed possessing herself of it, and that, if he should devise the same to his son Hiram Alonzo, she would in some manner acquire it, and that it would be thus diverted from his family. If this was a delusion, he had been possessed of it for a long time, because his former will gave the bulk of his property to trustees for the benefit of his grandson, thus depriving the son and his wife of ultimate ownership; and his present will is cast upon the same idea. He has also, so far as disclosed by the testimony, been consistent in his desire to so dispose of his property that in the main it would not finally come into the hands of his son's wife. The son was remembered in the will by a life estate in a portion of the realty, and was to receive the rents and profits, after the payments of certain expenses, arising out of the remainder, and the daughter-in-law was remembered by a share in the final distribution, so it is apparent that the testator was not biased by any feelings of animosity toward them. He believed, no doubt, that his son could not long survive him, even thinking that he (the testator) might survive him; and

in this he was justified, as subsequent events have demonstrated, for the wife is now prosecuting this proceeding, she being substituted for her deceased husband. Some of the witnesses indicate that the decedent was imbued with the idea that the daughter-in-law would resort to extreme measures in order to possess herself of the property, if it should be divided or bequeathed to his son. If this be so, it was not shown that it was a delusion. It may, for aught that appears, have had its foundation in fact. We do not mean to say that the daughter-in-law was possessed of any such purpose, because there is not a scintilla of evidence in the record to bear out the statement. On the contrary, the proven admissions of the decedent shows her treatment of him to have always been kind, indulgent and considerate. But what we mean is that his information may have been such as to superinduce the belief, and thus the state of his mind may have been the result thereof, and not of sheer delusion. Some of the witnesses relate that, when he was asked to give reasons for thinking that his daughter-in-law intended to possess herself of the property, he answered that the neighbors told him so. Further than this the matter was not pursued. Now, if he believed his neighbors, and acted upon neighborhood gossip, he was not possessed of a delusion; but the idea with which he was imbued had its basis in fact, and hence the will could not have been superinduced by an insane delusion: *Potter* v. *Jones*, 20 Or. 239 (25 Pac. 769, 12 L. R. A. 161). It is not altogether unnatural or unreasonable that he should desire to keep the property, or the bulk of it, in his family, rather than to have it pass beyond the line of consanguinity; and, while the will and codicil contain some seemingly peculiar provisions, they may be said to be peculiar to the testator, as known by his neighbors in his normal condition. It was suggested that the testator's mind was affected with other delusions; but if they existed at all, which is doubtful, they were such as in no way affected the disposition of his property.

10. The validity of both the will and codicil is also challenged upon the ground that they were not executed in the

manner and with the formalities required by law. The objections urged with the greater emphasis are that the witness Hughes did not see the testator sign, nor hear him acknowledge his signature to the writing, nor did he publish and declare the same and the codicil thereto to be his last will and testament in her presence; and it is further contended that the testator did not request Mrs. Hughes in either instance to attest the writing as a witness. For convenience and perspicuity we will dispose of the matter of publication first, and then discuss the other questions somewhat in the same connection. The statute has prescribed the formalities with which a will shall be executed. It shall be in writing, signed by the testator, or some person under his direction, in his presence, and shall be attested by two or more competent witnesses, subscribing their names to the will in the presence of the testator: Hill's Ann. Laws, § 3069. A codicil is required to be executed in the same manner and with like formalities. In the earlier history of the law, due publication was an essential prerequisite to a valid execution. This consisted in making known in the presence of the witnesses that the instrument being executed was the last will and testament of the testator. In some of the states the formality is preserved by statute, while in many others, as in our own, no allusion is made to it. Under this condition of the law, by the very great weight of authority, it is only necessary to observe the formalities so far as pointed out by the legislature, and publication in any manner is not a prerequisite to the validity of a will. The instrument may be well executed without a word being uttered or intimation made by the testator, or any person for him, to the attesting witnesses or in their presence, that the writing being signed or executed is a will; neither need they know anything of its nature or import: *Luper* v. *Werts,* 19 Or. 122, 135 (7 Am. Prob. Rep. 243, 23 Pac. 850). And, in further substantiation of the rule, see Schouler, Wills (2 ed.), § 326; Page, Wills, §. 227; *Canada's Appeal,* 47 Conn. 450; *Allen* v. *Griffin,* 69 Wis. 529 (35 N. W. 21).

11. There is signed at the foot of both the will and codicil

the name "R. L. Skinner," attended by a private seal. Both have appended an attestation clause, reciting, in effect, that the paper was signed, published, and declared by the testator to be his act in the presence of the witnesses, who, in his presence and at his request, and in the presence of each other, subscribed their names as witnesses. Subscribed thereto are the names "Mary Hughes" and "George G. Bingham" in the order named. Mr. Bingham testifies that he wrote the will at the request of Mr. Skinner on the day it bears date, December 12, 1898; that the name subscribed thereto is the signature of R. L. Skinner, written by the testator himself; that the name "R. L. Skinner," appearing subscribed to the other writing (the codicil), is his signature, also written by himself; that of the signatures "Mary Hughes" and "George G. Bingham," to both the will and codicil, "Mary Hughes" was written by her in the presence of the witness testifying and in the presence of Mr. Skinner; that the testator was occupying the front room of Mr. Hughes' house; that there was a little stand in the room, which the witness cleared off and used for writing the will; that Mrs. Hughes was called into the room, witness thinks, by himself; that Mr. Skinner told him that he wanted a witness to his will, and the paper was laid on the stand; that Mr. Skinner signed it, witness thinks, while Mrs. Hughes was standing by, witness being present at the time; then Mrs. Hughes sat down and signed it, and sat by the table while witness signed it; that the codicil was written in the same room, at the same stand, and signed in the same manner; and that before Mrs. Hughes signed, in either instance, the attestation clause was read over to her. A little later the witness repeats that the will was signed by Mr. Skinner, and then by Mrs. Hughes and himself, they standing within a foot of the testator; that, after the codicil was written, witness read it over to him, then Mrs. Hughes came in from the kitchen, and it was signed by Mr. Skinner, then by Mrs. Hughes, and then by the witness.

Mrs. Hughes testified, in effect, that she was in the kitchen (a room adjoining the one occupied by the testator) when the will

was being prepared by Mr. Bingham; that Bingham read part of the will over to the testator, but she did not hear distinctly enough to know what it was; that Bingham called her into the room, and that Mr. Skinner was sitting in a chair near the stand; that she did not see him sign his name, and could not swear whether he did or not; that she signed, and then Bingham signed; that testator was still sitting in his chair; that Bingham told her that the paper was Skinner's will, and she was to witness it; that, when the codicil was signed, the testator was sitting up in bed and signed it right at the foot of the bed; that witness was standing in the room at the time, and saw him sign that part of it; that Bingham told her in the presence of Skinner that the paper was a codicil; that the attestation clause of both the will and codicil was read over to her before she signed. On cross-examination she stated that she did not know whether Mr. Skinner signed the will or not; that she could not remember whether he spoke at all, or did anything to indicate his approval, or that Mr. Bingham said anything while the matter was being arranged; that at the time she signed she did not see the name of R. L. Skinner at the bottom of the will, but that she thought she saw him sign the codicil before she signed; that Skinner at no time requested her to sign either the will or codicil as a witness; that she could not say whether Skinner signed the will or not,—could not remember; thought she distinctly saw him sign the codicil, but did not see his signature after he wrote it; and that the testator did not request her to sign, but that Mr. Bingham did. When the will was first offered for probate, Mrs. Hughes signed the usual affidavit required for making proof in common form, whereby she deposed that she saw the testator subscribe both the will and codicil and that she signed as a witness at his request and in his presence.

From this evidence we are to determine the fact of attestation. Counsel frankly say that Mr. Bingham's evidence, if standing alone, is *prima facie* sufficient to establish a due execution; but they insist, inasmuch as the proponent elected to call Mrs. Hughes, and through her the fact was elicited that

she was unable to testify that the testator placed his name upon the identical paper to which her name was attached, her incompetency as an attesting witness was clearly shown. We speak now of the will only. It is a significant fact that Mrs. Hughes fails to say that the testator did not sign the will prior to her signing as a witness. She simply says that she does not remember that such was the case; thus leaving the implication or inference that the signing may have been done in her presence, but, if it was, she has forgotten it. The attestation clause refutes the idea that the testator did not sign in her presence and prior to her signing, and her affidavit in proof of the will bears quite as strongly in the same direction. Mr. Bingham's testimony is far more satisfactory. He is an attorney of learning and skill, and was employed to put the will in form, and in that connection attended to its execution. His positive declarations show that all the formalities were observed requisite to a due attestation, so that there is a clear preponderance of the weight of testimony in support thereof. Does the circumstance that Mrs. Hughes herself was unable to recall the necessary accompanying details vitiate it? The answer must be in the negative. The attestation, it is true, is not a matter of mere formality in affixing one's name to the will as a witness. There must be an active mentality connected with it. The witness must take cognizance of the signature of the person executing, either by seeing him write or by his acknowledgment of it in some manner, either expressly or impliedly, so that he can be able to say surely and unequivocally that the signature to the instrument is that of the person executing, previously appended. But the attestation of the will does not depend upon the memory of the attesting witness. The act is one, when once performed, which stands as an accomplished fact, and any subsequent failure of the memory of the witness, or willful purpose in suppressing what is known to have transpired, does not change or obliterate it. It may perchance stand unsubstantiated after applying the test of legal proof; but, if it once existed, it stands for all time as any other fact.

Further than this, the law comes to the aid of substantiation, in many cases where the memory of the witnesses is defective in being unable to recall all the attending circumstances, by invoking the presumption of a due observance of the formalities required by law. Thus, in *Allen* v. *Griffin*, 69 Wis. 529 (35 N. W. 21), it was held that, in the absence of clear proof that the witnesses signed before the testator affixed his signature, it should be presumed that the testator signed first. And, again, it is said that "on the death of the witnesses, or on the failure of their memory, the proof of the fact of execution begets the presumption that all the details of statutory requirements were complied with, * * * unless the contrary be proven": Beach, Wills, § 39. See, also, 1 Greenleaf, Ev. (15 ed.) 38a; 1 Jones, Ev. § 44. Accordingly, in the case of *In re Tyler's Estate*, 121 Cal. 405 (53 Pac. 928), where the signature of the testatrix and that of a deceased witness were proven, and the remaining witness, being called, identified his own signature, but could not remember whether the testatrix actually signed or verbally acknowledged her signature in his presence, or whether she declared the document to be her will or requested him to sign as an attesting witness, it was held that the proof was sufficient to authorize probate. So, in *McKee* v. *White*, 50 Pa. 354, where one of the witnesses, as in this case, recollected all about the execution, and testified that he wrote the will, subscribed it as a witness at the request of the testator, and thought the other witness, whom he called in for the purpose, subscribed it at the same time, but the second witness could not remember that he saw the testator sign, or who called him to be a witness, and that he did not hear anything said about the will, it was held sufficient to establish due execution. And, in the case of *Rugg* v. *Rugg*, 83 N. Y. 592, one of the witnesses, after stating that the testator signed after he did, subsequently expressed a doubt upon the subject and admitted that he might have been mistaken. The other testified that he did not remember that the testator signed last, and in further course of his examination stated that he (the witness) was the last to sign. To supply this equivocation or lapse of memory,

the executor, who was apparently not an attesting witness, testified distinctly to all that took place, the order in which the several acts were done, and that the testator subscribed before the attesting witnesses. Upon this showing it was held that the preponderance of the proof was in favor of a proper execution of the will, and that the surrogate could not come to any other conclusion; the court, speaking through Mr. Justice MILLER, saying: "Where there is a failure of recollection by the subscribing witnesses, the probate of the will cannot be defeated if the attestation clause and the surrounding circumstances satisfactorily establish its execution,"—citing *In re Kellum*, 52 N. Y. 517. These cases, of singular analogy to the one at bar, are sufficient to illustrate the principle upon which the fact of attestation and the due execution of a will may be established; and where, by reason of a failing memory, a witness is unable to recall the fact as to whether he or she saw the testator sign, or whether the testator signed first or last, or whether the witness was requested by the testator to attest the writing, the hiatus is supplied, in the absence of positive testimony to the contrary, by a presumption that the requirements of the law have been observed, which completes the proof and renders it sufficient upon which to direct a probate. And this is especially so where accompanied by an attestation clause reciting an observance of the necessary statutory formalities: *Allarie* v. *Allarie*, 37 N. J. Law, 312; *McCurdy* v. *Weall*, 42 N. J. Eq. 333 (7 Atl. 566).

12. As it pertains to the request by the testator to sign as an attesting witness, there need be but little further said. Mrs. Hughes frankly admits that Mr. Bingham called her to witness the will. Mr. Bingham was acting for the testator, and this was a sufficient request for the purpose: *Ames' Will*, 40 Or. 495 (67 Pac. 737). The request is but a step in bringing about the attestation, and, where the witness has signed as such, but slight evidence is required to warrant the assumption that it was done at the testator's instance; and an attestation clause attached, reciting the fact, is amply sufficient to establish it in the absence of a direct assertion that

such was not the case: *In re Nelson's Will,* 141 N. Y. 152 (36 N. E. 3). From these considerations we conclude that the will was properly attested, and should be admitted to probate.

The evidence as to the attestation and the execution of the codicil is manifestly stronger than that relating to the will, and it results, without further comment, that its probate should also follow. The decree of the court below will therefore be affirmed.                                    AFFIRMED.