Argued February 4; Affirmed March 9, 1948

# IN RE CHRISTOFFERSON'S ESTATE
## CHRISTOFFERSON ET AL. *v.*
## CHRISTOFFERSON ET AL.

190 P. (2d) 928

*Joseph M. Devers, Jr.,* and *Robert W. DeArmond,* of Salem, argued the cause for appellants. On the brief were Devers and DeArmond and Allan G. Carson, of Salem.

*Asa L. Lewelling,* of Salem, argued the cause and filed a brief for respondent.

Before Rossman, Chief Justice, and Belt, Bailey, Brand and Hay, Justices.

BAILEY, J.

This is an appeal from a decree of the circuit court of Marion county sustaining the validity of the last will and testament of Lillian R. Christofferson, who died May 30, 1945. The appellants, Lauren, sometimes referred to as Loren, George and Royal Christofferson, and Genevieve Dunning, are the four eldest children of the deceased. Her youngest sons, Gerald Christofferson, individually and as executor of the will, and Burns Christofferson are the respondents.

The will was executed in Salem, Oregon, on the 26th day of March, 1931. The subscribing witnesses thereto were Dr. R. E. Lee Steiner, superintendent of the Oregon State Hospital, and R. H. Bassett, an attorney in Salem. Under the terms of the will one-half of a 20-acre tract of land, located about seven miles northeast of the city of Salem, was devised to Burns and the other half to Gerald. All the rest, residue and remainder of her estate was devised and bequeathed to her six living children, share and share alike.

Contestants, appellants in this court, attack the will on the grounds that (1) it was not duly executed; (2) the testatrix was of unsound mind and did not possess testamentary capacity at the time of its execution; and (3) it was the result of undue influence and coercion by Gerald and Burns Christofferson.

In 1908 the Christofferson family, consisting of Lillian R. Christofferson, her husband Hans Christofferson, and six children, moved from La Grande, Oregon, and located upon the 20-acre tract of land hereinbefore mentioned. Hans Christofferson, in the fall of 1913, suffered a paralytic stroke which left him partially disabled. In February or March, 1914, he again suffered a stroke which rendered him permanently and totally disabled. Shortly thereafter Mrs. Christofferson, who was then about 46 years of age, became depressed and melancholy and on April 21, 1914, on complaint of her daughter, was committed to the Oregon State Hospital and discharged therefrom on May 18 of that year.

In 1918 one of Mrs. Christofferson's sons was killed while serving with the armed forces. Her son-in-law died in the same year. These bereavements and the difficulty experienced by her in getting someone to farm the 20-acre tract caused Mrs. Christofferson considerable worry. September 10, 1920, on her own application, she was admitted to the Oregon State Hospital for treatment and discharged on the 19th of that month. The record of the state hospital under date of September 16, 1920, in regard to this commitment contains the following statement: "This woman came under Voluntary Commitment. She was previously an inmate for a short time in 1914. Suffering from mild depression. Her condition then was very similar to her present state of mind. Her husband is paralyzed and she is said to have had much to worry her at home and felt the need of some rest and treatment. She is now much more cheerful and plans to return home next Sunday." September 19, 1920, she was "discharged as improved."

She was thereafter voluntarily committed to the

state hospital and discharged therefrom on the following dates: Committed May 28, 1926, discharged June 9, 1926; committed June 20, 1926, discharged July 2, 1926. On July 8, 1926, she was involuntarily committed for the second time, and on August 4 of that year paroled to her son, Gerald Christofferson "as recovered". She was granted a full discharge on September 1, 1929. The last commitment occurred on May 3, 1930, and was voluntary, and she was discharged on May 22 of that year. The last involuntary commitment which occurred on July 8, 1926, was not due to any material change in Mrs. Christofferson's condition but to facilitate her admission and release or parole from the hospital. Under a voluntary commitment, an applicant could not be detained more than 30 days. Ch. 125, Oregon Laws, 1919, codified as § 127-214, O. C. L. A. In regard to the last commitment the hospital record contains the following:

"May 3, 1930: Sixth commitment. Has been at home with her children since her parole from the institution in August, 1926. Her husband is partially paralyzed and the care of him was too much for her she states. She asked to be returned here so that she could get a rest. Is in very good physical condition, is quiet and orderly and is cooperating well. Diagnosis: 13-B, depressive type.

"May 22, 1930: Full discharge granted this day. Going to Salem, Ore. Condition, recovered."

Hans Christofferson died on September 24, 1930. He was named as beneficiary in the war risk insurance policy issued by the government to his deceased son and had been receiving the payments thereon. After his death Mrs. Christofferson sought advice concerning the unpaid balance on the policy and was referred to Mr. Bassett, who was familiar with such matters. This was in October, 1930. In November of that year a

petition was filed in the probate court for the administration of the deceased son's estate, and Gerald Christofferson was appointed administrator of that estate.

During her conferences with Mr. Bassett concerning her deceased son's estate, Mrs. Christofferson discussed with him the preparation of her last will and testament. Because Mr. Bassett knew of Mrs. Christofferson's previous commitments to the Oregon State Hospital, he arranged to have Dr. Steiner as one of the subscribing witnesses to her will, which was executed in Dr. Steiner's office.

On the same day that the testatrix executed the will, she signed and verified a petition for the appointment of a guardian of her estate. In it she alleged that she was owner of the 20-acre tract of land, to which we have referred, of the approximate value of $3500, and of personal property of the approximate value of $4,800. The petition then continues as follows:

"That during the past fifteen years or thereabouts, to and until September, 1930, my deceased husband was an invalid, requiring my constant care and attention; and that because of the work and the many worries falling upon my shoulders in the care of my deceased husband and the rearing of my children, and the managing of the property, particularly the home place, I have, upon several occasions, become sick in mind and body, and during the time of such sickness when run down and in a weakened condition, been treated for a mental sickness at the Oregon State Hospital; the last occasion being as a voluntary patient from May 3, 1930 to May 21, 1930, and on said last named date, I was discharged as cured, and that said hospital has no further jurisdiction over my person. That such periods of sickness have only been of temporary duration and at infrequent intervals, but I am ad-

vised, and believe, and therefore allege that when my physical condition is run down and I am weakened, my mental sickness is of such a nature that it might recur, and because of my age and the possibility of such sickness recurring, I believe, and therefore allege that it is to the best interests of my estate and to the interests of my children that a suitable and proper guardian be appointed to take charge of my properties and to manage the same and thereby avoid, if such a thing is possible any difficulties or controversies between my children relative to the management of my properties."

This petition was filed on April 3, 1931, and on the same day the United States National Bank of Salem, Oregon, was appointed guardian of her estate.

The first contention urged by the contestants is that the proponents have failed to prove that the will was duly executed. In support of this proposition they call attention to Dr. Steiner's testimony in which he stated: He did not know that the signature on the will was that of Mrs. Lillian Christofferson; he did not know that there was a signature on the will at the time he signed as a witness; Mrs. Christofferson did not indicate to him that the instrument was her last will and testament; he signed the will in the presence of Mrs. Christofferson, at the request of Mr. Bassett who "represented her as her attorney"; he had no clear recollection of having seen Mrs. Christofferson sign the will; and he might have seen her signature on the will before he signed it. He further testified as follows:

"Q. Do you recall any of the circumstances that led up to the attestation of that instrument? Do you recall anything about that? A. Nothing except that she was making her last will.

"Q. You knew she was making her last will? A. That was my impression."

The will has the following attestation clause, signed by the subscribing witnesses hereinbefore mentioned:

"The foregoing instrument, consisting of three pages, including this page, was signed, sealed, and declared, and published by the said Lillian R. Christofferson, Testatrix therein named as and for her Last Will and Testament, and her sole and complete act and deed in the presence of us, who at her request and in her presence and in the presence of each other have subscribed our names as witnesses thereto, this twenty-sixth day of March, A. D. One Thousand Nine Hundred and Thirty One, and we, and each of us do hereby certify that the name of said Testatrix was duly made on said foregoing instrument by herself and was seen thereon by us before we signed as witnesses as aforesaid, and that we believe her to be, at this time, of sound mind and memory."

Section 18-201, O. C. L. A., provides: "Every will shall be in writing, signed by the testator, or by some other person under his direction, in his presence, and shall be attested by two or more competent witnesses, subscribing their names to the will, in the presence of the testator." This section, and not § 2-808, O.C. L. A., relied upon by the contestants and which defines in general terms a "subscribing witness", is controlling in the execution of wills. *In re Estate of Shaff*, 125 Or. 288, 266 P. 630; *In re Estate of Neil*, 111 Or. 282, 290, 226 P. 439. It is not necessary that the witnesses should sign in the presence of each other, nor is it necessary that the testator should declare the instrument to be his last will. If the testator actually signs the will and the witnesses attest his signature at his request, it is sufficient even though the witnesses may not know the purport or contents of the instrument. *In re Estate of Neil*, supra; *In re Estate of Shaff*, supra; *In re Davis' Will*, 172 Or. 354, 362, 142 P. (2d) 143.

■ Dr. Steiner admitted that Mr. Bassett had asked him in the presence of the testatrix to witness the will. He knew that Mr. Bassett was acting for her, and this action by Mr. Bassett was a sufficient request to meet the requirement of the statute. *Skinner's Will,* 40 Or. 571, 62 P. 523, 67 P. 951; *Ames' Will,* 40 Or. 495, 67 P. 737. In addition to this testimony Mr. Bassett testified that Mrs. Christofferson signed the will in the presence of the subscribing witnesses and that they, in her presence and at her request and in the presence of each other, subscribed their names thereto. This testimony has not in any way been contradicted. Dr. Steiner, by reason of a failing memory, was unable to recall the facts relating to the execution of the will. He remembered signing it and the fact that Mrs. Christofferson was present at the time he signed. In the case of Skinner's Will, supra, this court, after reviewing decisions from other jurisdictions involving the failure of subscribing witnesses to recollect important facts concerning the execution of the will, observed:

"* * * These cases, of singular analogy to the one at bar, are sufficient to illustrate the principle upon which the fact of attestation and the due execution of a will may be established; and where, by reason of a failing memory, a witness is unable to recall the fact as to whether he or she saw the testator sign, or whether the testator signed first or last, or whether the witness was requested by the testator to attest the writing, the hiatus is supplied, in the absence of positive testimony to the contrary, by a presumption that the requirements of the law have been observed, which completes the proof and renders it sufficient upon which to direct a probate. And this is especially so where accompanied by an attestation clause reciting an observance of the necessary statutory formalities".

■■ This court is committed to the doctrine that an attestation clause, which recites compliance with the statutory requirements of execution of a will and is signed by the witnesses, is *prima facie* evidence of the due execution of the instrument. *In re Fletcher's Estate*, 147 Or. 139, 143, 32 P. (2d) 123; *In re Davis' Will*, supra; *In re Wade's Estate*, 174 Or. 531, 149 P. (2d) 947. There was no attempt on the part of Dr. Steiner to impeach the due execution of the will. About 15 years had elapsed between the excution thereof and the time he gave his testimony and he was simply unable to remember all of the facts in connection with its execution. There is no merit in the contention of the contestants that the record fails to show the due execution of the will.

■ We shall now consider the question whether Mrs. Christofferson possessed testamentary capacity on March 26, 1931, the date she signed the will here involved. Testimony has been introduced by both the contestants and proponents relating to her physical and mental condition from the time of her first commitment to the Oregon State Hospital, in 1914, to the date of her death in 1945. The all-important issue is the condition of Mrs. Christofferson's mind on the date she attached her signature to the will. Evidence of her mental condition, as revealed by her acts, conduct, habits and conversation, both before and after March 26, 1931, is relevant only for the purpose of throwing light on the condition of her mind at the crucial moment. The probative force of such evidence depends upon the relation in time between the statements or conduct of the testatrix and the date of the execution of the will. *In re Bond's Estate*, 172 Or. 509, 520, 143 P. (2d) 244; *In re Morley's Estate*, 138 Or. 75, 5 P. (2d) 92.

■ On proponents rested the burden of proving that

the testatrix had sufficient testamentary capacity to execute the will, but they had the benefit of the presumption that she was competent inasmuch as the will was executed in due form. *In re Will of Robert Carr,* 121 Or. 574, 580, 256 P. 390; *In re Morley's Estate,* supra; *In re Shanks' Estate,* 168 Or. 650, 662, 126 P. (2d) 504.

We shall now refer briefly to the testimony of proponents' witnesses. Both of the subscribing witnesses testified that in their opinion Mrs. Christofferson was, at the time she signed the will, competent to execute the same. From some time in October, 1930, up to the day of the execution of the will, Mr. Bassett saw Mrs. Christofferson frequently and discussed various matters with her and on that day he was with her from three to four hours. He was thus given an excellent opportunity to form an opinion as to her sanity. Dr. Steiner, an eminent psychiatrist, who was superintendent of the institution to which Mrs. Christofferson had been committed, stated that his memory was that Mrs. Christofferson was a manic-depressive, but that persons affected with that disease had normal periods when they are thoroughly competent to transact business. The evidence of these witnesses, who had known the testatrix for a considerable length of time before affixing their signatures to the will, is entitled to a great deal of weight.

Mr. K. E. Wenger, who was trust officer of the United States National Bank of Salem at the time that bank was appointed guardian of the estate of Mrs. Christofferson, testified that he became acquainted with her in the spring of 1931 and that he had had ''several conferences with her about guardianship affairs, estate property, and her needs and so on'' and that her conduct was normal, ''and I had no reason to

question her sanity or her ability to handle her ordinary requirements.'' Mr. David Eyre, an officer of the bank with which Mrs. Christofferson did business, stated that he had known her since 1912 and had business with her after her husband died and prior to the appointment of a guardian; that he had no opinion as to her mental sanity ''during that period''; that he thought she was competent to conduct her business; and that when she presented checks he cashed them.

Burns Christofferson, one of the proponents, was born, and has always resided, on the 20-acre tract. He is the youngest child and was farming the home place at the time his father died in September, 1930. He testified that upon his mother's return from the hospital in 1926, and again in 1930, she was very happy and not depressed or melancholy, and that in his opinion she was sane in March, 1931. Burns was married sometime in October, 1930, and apparently his mother was living with him when she executed her will.

Gerald Christofferson, the other proponent, was born in 1905 and did not leave the home place until 1929. In March, 1931, he was operating a store at Chemawa, and on the day of the execution of the will he brought his mother to Salem, as he had frequently done. He did not know anything about the execution of the will until a year or two thereafter. He had talked to his mother at various times about having a guardian of her estate appointed, but stated that he had not advised her to do so. It was his opinion that his mother was sane and competent to make a will on the date the will in question was executed.

Other witnesses who testified for proponents are the following: William D. Greig, who had known the testratrix 39 years and who, during most of that time, lived on a tract of land adjoining that owned by her,

stated that she was happy part of the time and sometimes a little bit melancholy, but that he thought she was sane on the 26th of March, 1931. C. E. Andresen, who had known the testatrix 25 or 30 years and had lived on a farm about a half a mile from her residence and who had visited the Christoffersons "several times a week at times", was of the opinion that she was sane in March, 1931. This opinion, he stated, was based upon "just being around as much as I was. I never seen anything out of the way." He testified that he had never seen her when she was unhappy or "abnormally depressed". D. E. Janzen first became acquainted with Mrs. Christofferson in March, 1930, at which time he was living about a quarter of a mile from her place. He visited Mrs. Christofferson a couple of times during the summer of 1930 and she visited at his home three or four times that same summer. He stated that he thought "she was mentally all right", that from what he "knew of her she was always happy and satisfied" and at times would joke with him. Thomas R. Sim testified that he had known Mrs. Christofferson since 1910 and had visited at her home many times, that in 1931 or 1932 he had borrowed $150 from her which later had been repaid. He did not see her in March, 1931, but saw her many times before and after that date. He stated that prior to his business dealing with her in 1931 he had visited at her home many times and "lots of times" he saw her "happy and joking". It was his opinion that she was sane at the time he had the business dealing with her. Don H. Wall, Bishop of the Latter Day Saints Church, testified that he came to Salem in December, 1937; that Mrs. Christofferson attended his church; that he had occasion to talk with her many times, and had visited at her home. He stated that if there was "any.

thing wrong with her I never discovered it''; and that she ''was just an ordinary nice, elderly lady. I always enjoyed talking with her.''

Melvin Gruenfelder was called as a witness by the contestants. He had lived about three miles from Mrs. Christofferson's home for 25 years, and had been acquainted with her for about 20 years. He farmed the Christofferson place in 1921 and 1922, and had seen and talked to her about a week before her death. Asked about her sanity at that time he said that ''she appeared to be all right. I talked to her. She knew me and asked how my mother was, so she couldn't have been insane; she knew everybody. Q. Was she sane all the times, as far as you know, then? A. She might have spells like anyone else, but you wouldn't call them insane. If she was, she didn't show it, is my notion.''

We now refer to the testimony of contestants' other witnesses. Mrs. Genevieve Dunning, who is the eldest child and only daughter of the decedent, has not lived in Oregon since about 1920, and had seen her mother only about once a year since that time. She testified that she did not know where she (Mrs. Dunning) was living in 1931; that she attended her father's funeral in September, 1930, at which time her mother recognized her and the other children; and that she thought her mother was insane then and in 1931. Her husband, Guy E. Dunning, was at the time he testified a practicing attorney living in Seattle, Washington. He saw Mrs. Christofferson in 1919 and thought that she was at that time mentally unbalanced. He gave as the reason for his opinion that she had ''fits of depression and fits of—not being fully cognizant of what was going on. She used to—if I were alone in the living room she would quite frequently come up to me and whisper something—oh, just didn't amount to any-

thing at all.'' He did not remember the times he had seen her between 1919 and 1930 but was of the opinion that he had seen her several times during that period. He thought he saw her in 1931 and again in 1932 or 1933. He stated, as his opinion, that she was also insane in 1931 and gave as the reason for this opinion that she lacked understanding ''of matters or of the business matters, financial matters, that we talked over'', and that she did not speak coherently and would become depressed at times. Both Mr. and Mrs. Dunning were very indefinite concerning when they had seen the testatrix and what actually occurred when they visited her.

Lauren Christofferson left home in 1917 and enlisted in the navy. On his discharge from service in 1919 he moved to Eugene. He visited his parents ''very little'' thereafter. He saw his mother at his father's funeral. He stated that he did not think his mother's mind was sound in March, 1931.'' This opinion was based upon the fact that she had been committed to the Oregon State Hospital several times and because ''she was declared incompetent and had a guardian to take care of her funds.'' He testified that his mother always recognized her children when she saw them and that his first child was born in her home where he had sent his wife to be cared for by his mother.

Contestant George Christofferson did not testify because of ill health. His wife Harriett, however, was a witness. She testified that she married George in 1919, that she became acquainted with Mrs. Christofferson in 1917, and that she thought she was insane at that time because she cried so much. She saw her mother-in-law often before Mr. Christofferson's death. Burns Christofferson was married about three weeks

after his father's death and because George and his wife were not invited to his wedding, they did not see her very often thereafter until in 1937. She stated that she thought her mother-in-law was insane in 1937, and that her condition was the same then as it was in 1917. "Some times", the witness stated, "she was pretty nice and seems like she would be nice to people when she was shopping. She was good to the clerks", and "would at times appear quite normal before these clerks and so forth". She also testified that Mrs. Christofferson always recognized her children and knew what property she had.

Royal Christofferson lived on the farm until he was married in 1925. He has lived in Eugene since 1935. From 1933, for two or three years, his mother lived with him in Salem. He thought she was insane at that time. While she was living with him "she was not violently insane, but I would say a form of insanity." He also thought she was insane in 1931. His opinion is based upon the fact that she was incompetent to transact business. "She didn't know how to do anything she had to do. We had to do it for her and she wouldn't go places alone and would sit around and beg us to take her places and never lift a hand to do anything." He never saw his mother when she did not recognize her children and when she did not have a general idea about her property. Royal's wife, Evelyn, was also a witness for contestants. She became acquainted with Mrs. Christofferson in 1923, at which time she thought she was insane. She testified that Mrs. Christofferson was always depressed and never happy and talked mostly of the past. The first time she saw her "actually have a spell [of crying] was about 1926." She thought that she saw her some time in March, 1931, and that she was then insane. This

opinion was based upon the fact that she was always depressed. She stated that her mother-in-law at all times knew her children and, as far as the witness knew, she knew what property she had.

Andrew Zahara testified that he lived about three-quarters of a mile from the Christofferson home and that between 1920 and 1925 he visited them many times and that during that period he was of the opinion that she was insane for the reason that she did not talk coherently. Mrs. Lola Longmire, who lived in Walla Walla, Washington, and was the sister-in-law of Mrs. Royal Christofferson, testified that she was a registered nurse and had, with Mrs. Royal Christofferson, visited the deceased in September, 1930. The witness stated that she was a "very talkative type of person to start with and cried most of the time I was talking with her." She thought that Mrs. Christofferson was insane at that time. She stated that she saw her again in January and February, 1931, and that her condition was then worse. "I didn't think she should be around Evelyn's children alone; alone with Evelyn's children. That is my personal opinion and I was quite—just trying very hard to convince them that she shouldn't leave her alone with the children."

Dr. Benjamin F. Williams was the only other witness called by the contestants. He stated that he had practiced medicine since 1901 and had specialized in psychiatry for the past 25 years, and was then, and had been for the past seven years, psychiatrist at the Oregon State Hospital. He had never seen Mrs. Christofferson. He was unable to diagnose her case from the hospital records. Based upon those records and upon the assumption that "she no longer was happy and sang and no longer evidenced any sense of humor and was given to depression and weeping and when

she was not in the hospital at various periods of time" he was of the opinion that she had not fully recovered from her condition as a manic-depressive. On cross-examination Dr. Williams gave the following testimony:

"Q. Doctor, am I correct in assuming from your testimony that there are definitely periods of normalcy where there is a diagnosis of manic-depressive? A. Yes, sir.

"Q. And that the only times in which the person so diagnosed is affected in their judgment is in the manic phase or the depressive manic phase? A. Or in the interim when either have not cleared.

"Q. And during the normal period their judgment would not be affected? A. If they were entirely cleared.

"Q. But there are such periods? A. There may be such periods. I would not like to say they are or they are not always.

"Q. Such periods definitely exist? Periods of normalcy? A. Yes."

Dr. Williams answered the following question propounded to him by the court in the affirmative: "Then a person who recognizes her own heirs, knows who they are and their relationship to her, knows her property, she still may be insane?" We do not find any statement by Dr. Williams, as asserted by contestants, that Mrs. Christofferson was, in his opinion, insane on March 26, 1931.

At the time the will was executed Mrs. Christofferson considered the 20-acre tract of the value of about $3500 and placed the value of the rest of her property at $4800. These values are taken from the petition for appointment of a guardian. Her two youngest children, Gerald and Burns, remained at home long after the other children had left. They did much to help their parents when they needed assistance. Burns

has always lived on this acreage. To him was devised the ten acres on which the buildings were located. Under these circumstances we see nothing unnatural in the way the testratrix divided her property.

The order appointing the guardian of Mrs. Christofferson's estate was not made until several days after the execution of the will. It contains the following:

> " * * * And that because of petitioner's age and possibility of such physical and mental sickness recurring, it is to the best interests of said petitioner's estate, and to the heirs-at-law of said petitioner, that a suitable and proper guardian be appointed to take charge of and manage petitioner's estate. Petitioner personally petitions for this guardianship to avoid, if such a thing is possible, any difficulties or controversies which might arise between her children relative to the management of this property; such a controversy being imminent at this time, and this proceeding is instituted to stop such controversy, and to prevent any further controversy concerning the management of said estate."

■ There is nothing contained in the petition or the order appointing the guardian which would indicate that a guardian was being appointed because of the then insanity of the ward. This is an important distinction. Such an appointment differs materially from an appointment on account of insanity. *In re Southman's Estate,* 178 Or. 462, 480, 168 P. (2d) 572.

■ Dr. Williams' testimony has been given careful consideration. Predicated, as it is, upon a hypothetical question based almost exclusively on the observations and testimony of interested, non-expert witnesses, it is of slight probative value. *In re Linville's Estate,* 137 Or. 145, 300 P. 505; *In re Shanks' Estate,* supra.

See also *McGreal v. Culhane,* 172 Or. 337, 141 P. (2d) 828; *In re Davis' Estate,* supra.

We have only the typewritten record here. On the other hand, the trial judge, faced by the same issues, heard spoken the words we now read. He observed the conduct and expressions of the litigants and of the other witnesses, whereas we can not make an informed, independent conjecture as to such conduct or expressions. From the living record he found the factual issues in favor of the validity of the will. There is nothing in the record sufficient to convince us that, if we had seen the witnesses and heard the evidence, we would not have reached the same conclusion. Much less is there anything in it that convinces us that, not having seen or heard it made, we are justified in reversing his findings which were based upon more than can be before us.

■ We are of the opinion that Mrs. Christofferson had testamentary capacity to execute the will here in question and that such will is valid. *In re Walther's Estate,* 177 Or. 382, 163 P. (2d) 285; *In re Johnson's Estate,* 162 Or. 97, 130, 91 P. (2d) 330.

■ We have carefully examined the contention made by the contestants that the will was the result of undue influence and coercion by Gerald and Burns Christofferson. After viewing the entire record we find that this contention is without merit.

The decree appealed from is affirmed.