Argued September 5, affirmed October 17, 1950

IN THE MATTER OF THE ESTATE OF OSCAR BEER, DECEASED

# WHITE ET AL. *v.* MORTON
222 P. (2d) 1005

*James T. Chinnock,* of Grants Pass, argued the cause and filed briefs for appellants.

*George W. Kellington,* of Medford, argued the cause for respondents. On the brief was V. A. C. Ahlf, of Grants Pass.

Before LUSK, Chief Justice, and BRAND, BAILEY, HAY, LATOURETTE and WARNER, Justices.

WARNER, J.

On February 26, 1945, Oscar Beer, an uncle of the contestants and appellants, Frank Grunow, Emma Grunow White and Fritz Grunow, died leaving a will wherein a nominal bequest of $1.00 was made to each said contestant. The remainder of his estate was devised and bequeathed to Archie Morton, his friend of more than twenty years. The will, so far as material herein, provided:

> "All the rest, residue and remainder of my estate, of whatsoever kind and nature, and wheresoever situate, I give, devise and bequeath unto my friend, ARCHIE MORTON. I make this gift unto Archie Morton for the reason that Archie Morton has been a good, kind friend to me, and has for many years rendered unto me valuable services and will continue said services for me during the rest of my life if he survives me. More than twenty years ago my friend and I made a pledge one to the other that in the event either of us became ill or needed the help of the other we would give such help, and when I needed Archie Morton he kept his pledge."

The will was executed on the 27th day of June, 1944. After it was admitted to probate, the appellants instituted a proceeding attacking its validity on two grounds: (1) Lack of testatmentary capacity, and (2) Undue influence. By stipulation the contest was transferred to the Circuit Court where, after hearing, a decree was entered directing that the aforesaid will of Beer's be admitted to probate as his Last Will and Testament. From that decree, Beer's two nephews and his niece appeal to this court.

The first and most important question here is whether the testator had sufficient mental capacity on June 27, 1944, to make a will. Did he understand the transaction in which he was engaged? Did he know how he wanted to dispose of his property? Did he understand and appreciate the natural objects of his bounty?

Mr. Beer was 86 years old at the time of his death. His later years, beginning in 1943, were attended with illness and more or less continuous hospitalization. In the month of April, 1943, he was taken from his homestead situated in Del Norte County, California, but near Takilma, Oregon. From that time until some time in August, 1943, he was a patient in two different hospitals at Crescent City, California. On September 30, 1943, the testator entered Josephine General Hospital at Grants Pass, Oregon, where he was under the care and supervision of Dr. C. J. Moser, a physician and surgeon of that city. There he remained until on or about October 16, 1943. Not long thereafter, he again entered the same hospital where Dr. Moser performed a prostatectomy. Mr. Beer left the hospital on January 18, 1944, going directly to the Stansfield Convalescent Home in Grants Pass, where he remained until March 21 of that year. From there he was transferred to the McCarter Convalescent Home in the same city, where he remained until his death thereon February 26, 1945.

It is true, as urged by the contestants, that they, as Mr. Beer's next of kin, were the natural objects of his bounty within the usual definition of that term. *In re Walther's Estate,* 177 Or. 382, 397, 163 P. (2d) 285. However, the Beer's will cannot be characterized as unnatural merely because it preferred Archie Morton to them. Morton was his friend for more than twenty years. The record is eloquent that Morton was in every

respect, as declared by the testator in his will, a "good, kind friend" who had rendered valuable services during the period of their acquaintance and who loyally and promptly responded to the mutual pledge made during the earlier years of their friendship that in the event either of them became ill or needed the help of the other, the other would give such help.

The record is equally clear that the relations existing between the testator and the contestants were not particularly close. On occasions they were far from cordial and at times were even hostile. We will briefly refer to three separate incidents, each involving a different contestant. These incidents, in our opinion, could easily account for and explain the reason for the extinguishment of all feeling of obligation or sense of duty on the part of Mr. Beer toward the contestant particularly involved. At the time of the execution of the will, a suit was pending in the Superior Court of the State of Washington wherein the testator was plaintiff and the contestant, Frank Grunow, and his wife were defendants. This suit was for the recovery of $1,200.00 loaned by the testator to the defendants in 1942 and made upon their promise to secure the same by the execution of a mortgage on certain Seattle real property which they failed to do. Subsequent to testator's death, and on July 13, 1945, a decree was· entered in the Washington suit granting all the relief prayed for by the testator and reciting that the conduct of the contestant, Frank Grunow, and his wife constituted a fraud upon Mr. Beer.

As to the contestant, Fritz Grunow, there is uncontradicted evidence that he and Mr. Beer were once engaged in a cattle venture which resulted in some disagreement, causing Beer to believe and assert to others

that his nephew, Fritz, "tried to beat him out of some money." Fritz Grunow himself testified to a difference he had with his uncle over the making of an affidavit, which was followed by Mr. Beer's refusal to speak to him for a long time thereafter.

Emma Grunow White, the third contestant, had incurred the displeasure of the testator about a year before the making of his will when she petitioned for her appointment as Mr. Beer's guardian in the County Court of Josephine County. That petition was filed June 16, 1943, without Mr. Beer's knowledge or consent. We find in Mr. Beer's petition for Mrs. White's removal and the termination of that guardianship filed September 28, 1943, his statement that Mrs. White "has never in the past been very solicitous of the welfare of your petitioner, and it is not his desire that she should come into the possession of any of the property belonging to him, either through guardianship, or an administration of the estate, after the decease of your petitioner." It will be seen that the events referred to involve one or the other of each of the contestants. Each occurred shortly before or was subsisting at the time he made his will, except possibly his controversy with Fritz concerning which we have no dates. Moreover, before and particularly subsequent to the beginning of Mr. Beer's hospitalization in 1943, he freely and frequently expressed his displeasure and irritation growing out of the conduct of the contestants and was equally vocal in the indication of his fondness for Mr. Morton and his appreciation for the services rendered by that beneficiary both before and subsequent to his hospitalization. We are impressed that under all circumstances revealed by the record, the will lacks the unnatural quality contended by the contestants and

is, on the other hand, a natural and logical expression of appreciation for the kindly and devoted services rendered by Mr. Morton to his old friend, Mr. Beer.

■ The contestants introduced the record of the California guardianship filed in the Superior Court of Del Norte County of that state on June 21, 1943. They also introduced the record of the Oregon guardianship filed in the County Court of Josephine County, Oregon, on June 16, 1943, wherein testator's niece, Mrs. White, was the petitioner. The record in the Oregon guardianship discloses that after notice and hearing, with personal appearance by Mr. Beer, the court on the 13th day of October, 1943, entered an order removing Mrs. White as Mr. Beer's guardian and declaring, among other things, that Mr. Beer was "competent in all respects to transact all of his business affairs." The California guardianship was apparently continuing at the time of the testator's death. It is the contention of counsel for contestants that the Oregon guardianship was in effect at the same time, although counsel fails to assign any reason why the order of October 13, 1943, should be treated as a nullity.

These guardianship proceedings are urged upon us as evidence of Mr. Beer's mental incapacity to make a will on June 27, 1944. Assuming that both the California and Oregon guardianships were in effect at that time, they are not conclusive as to the status of the testator's mental capacity on that date.

In *In re Provolt's Estate,* 175 Or. 128, 131, 151 P. (2d) 736, it is said:

"The appointment of a guardian creates a presumption of mental incapacity to make a will, but it is a disputable presumption which may be overcome by evidence to the contrary." Citing cases.

■ The condition of the testator's mind at the precise time of the execution of the will is the determining factor. *In re Christofferson's Estate,* 183 Or. 75, 84, 190 P. (2d) 928. Evidence of the testator's mental condition as revealed by his acts, conduct, habits and conversations, both before and after June 27, 1944, is relevant to the purpose of throwing light on the condition of his mind at the moment he executed the will. *In re Christofferson's Estate,* supra.

■ The burden of proving that Mr. Beer had sufficient testamentary capacity is upon the proponents, but in this they have the benefit of the presumption of his competency where the will, as in this instance, was executed in due form. *In re Christofferson's Estate,* supra, at page 85.

■ Mr. Beer was a bachelor who long prior to his hospitalization in 1943 had lived alone on his homestead near Takilma, Oregon, where he was engaged in raising cattle. He enjoyed friendly relations with, and the apparent respect of his neighbors. Although 85 years old when he entered the hospital at Crescent City, California, in April, 1943, there is nothing to suggest that Mr. Beer had not had other than usual good physical and mental health prior thereto. The guardianship proceedings in the California and Oregon courts in June of that year constitute the first record intimation of anything to the contrary.

We have previously indicated that from April, 1943, to and until the date of his death, Mr. Beer was more or less continuously hospitalized. During these last twenty-two months of his life he was subject to the observation of a host of disinterested witnesses. Many of them were endowed with a background of professional experience and training, giving additional weight

to their testimony concerning the condition of Mr. Beer's health, mentally and physically, during that time. Summarizing generally the testimony of Fred Haight, a county supervisor for Del Norte County, California, and one of the men who brought Mr. Beer from his homestead to the hospital; the testimony of Frank S. Wagner, superintendent of the County Hospital in Crescent City; Rose Elizabeth Geiger, the nurse who attended the decedent while in the California hospital; Ruth Lafferty, a registered nurse attending him in the Josephine General Hospital at Grants Pass; Dr. C. J. Moser, the surgeon performing the prostatectomy upon Mr. Beer while in that hospital; the testimony of Isabel McCormick, the superintendent of the nurses in that hospital; and the testimony of Rachel A. McCarter, a registered nurse and the proprietor of the McCarter Convalescent Home, we are persuaded that Mr. Beer's condition can be correctly described in terms of testimony so given as being "mentally all right," a "normal" and "very smart old man who knew what he was doing all the time" and who "was not easily led," as having "a mind of his own," with a "mental condition very good for a man of his age," with a "physique so perfect" that "few young men could go through his kind of operation and come out so well," as "capable of judging and making decisions," "intelligent and bright as anyone could be," and "always jolly and joking about things as a normal person." This line of testimony further indicates that within six weeks after his entry into the McCarter Convalescent Home, he was able to go up and down the stairs for his meals each day to and until the day he died.

Appellants in their brief, notwithstanding the preponderance of testimony to the contrary, speak of a

"continuously progressive mental condition of senile dementia which destroyed both the mind and memory" of Mr. Beer. Even though we concede that a person 86 years old would no doubt experience a species of deterioration usual and incidental to the normal aging processes, we are yet unable to discover a scintilla of evidence which justifies the extravagant claim reflected by appellants' brief nor, indeed, anything to warrant the conclusion that Mr. Beer was mentally incapacitated so as to impair his ability to execute a valid will on June 27, 1944. We are of the opinion that the presumption of mental incapacity suggested by the California or Oregon guardianships was fully met and overcome by the testimony adduced by the proponents.

■ The testimony of the subscribing witnesses, aided by the presumption of sanity which follows proof of due execution, is entitled to great weight in determining the testator's mental capacity at the time of the execution of the will. *In re Walther's Estate,* supra, at page 401; *In re Christofferson's Estate,* supra, at page 84.

■ The testator, while a patient at the McCarter Convalescent Home, requested Archie Morton to get a lawyer for him for the purpose of drawing a will. Mr. Morton conveyed this message to Mrs. V. A. C. Ahlf, attorney for the respondents herein. The record discloses that she was not then Mr. Morton's attorney and did not become so until about a year before the hearing in this matter.

Some time after Mr. Beer's request for counsel, the exact time of which is not indicated, Mrs. Ahlf went to the McCarter Home and in Mr. Beer's room there and in the presence of Mrs. McCarter, conferred with the testator concerning the disposition of his property by will. The testimony indicates that he was asked to

name and did name his relatives and indicated very positively that he did not want to make any provision for them other than reflected by the will. In response to Mrs. Ahlf's inquiry for the reason why he did not want to make more generous provision for the contestants, we learn from Mrs. McCarter that he then said "that they never did anything for him and he wanted Mr. Morton to have it because he was always good to him."

The will when prepared was delivered by Mrs. Ahlf to Mrs. Gladys E. Youngblood. Mrs. Youngblood since 1939 had been continuously employed in a secretarial capacity in various offices in the Josephine County Court House. For a time she was employed in the office of the district attorney, at one time in the office of the county clerk, and at the time of the hearing she was a secretary in the office of the county judge. Mrs. Youngblood had been a friend of Mr. Beer since 1933 or 1934. She functioned as one of his business advisors and was familiar with his affairs. It was she who carried the will to the McCarter Convalescent Home for his execution. At that time she took with her Dr. S. B. Osgood, a physician and surgeon of Grants Pass, Oregon, for the purpose of obtaining his professional advice on the then mental condition of Mr. Beer. The doctor proceeded to make the requested examination in the presence of Mrs. Youngblood and Mr. and Mrs. McCarter. At the conclusion of his examination he gave as his opinion that "Mr. Beer was mentally competent to transact business at that time." Thereafter and in the presence of the doctor and the other parties named, Mrs. Youngblood read the will to Mr. Beer and he advised her that "it was what he wanted." He then took the will from her and with the aid of a magnifying glass

took quite a while to read it. At the conclusion of his reading, he signed it in the presence of Rachel A. Mc-Carter and Thomas R. McCarter, her husband, as witnesses thereto. Dr. Osgood and Mrs. Youngblood were also present at that time.

The high standing of the persons present at the time of the examination by Dr. Osgood and the reading and executing of the will, their acquaintance with the testator, and the manner in which their testimony supports the actions and conversations of the testator with reference to the drafting, reading and executing of the will, establishes testator's capacity at the time of the will's execution beyond any reasonable doubt.

■ Contestants' complaint and the examination of witnesses by contestants' counsel at the hearing stress the partial blindness of Mr. Beer. Contestants would have us believe that he was unable to read the instrument which he signed as his Last Will and Testament. There is no doubt that Mr. Beer's vision was seriously impaired. He was partially, if not wholly blind in one eye and read with the other with some difficulty. We have examined this line of evidence carefully and are convinced that Mr. Beer, although reading with difficulty, could read and understand what he read, particularly when aided by a magnifying glass which he used at the time he read the will immediately before he signed it.

This court said in the case of *In re Estate of Riggs,* 120 Or. 38, 63, 241 P. 70, 250 P. 753:

"Undue influence is not ordinary influence. It must be such as to overcome the free volition or conscious judgment of the testator and to substitute the wicked purpose of another. Suggestion or advice by a friend or relative, or one in confidential

relation, is not undue influence, if it leaves the mind free to act on its own judgment.''

■ We have carefully reviewed the testimony to determine whether or not Mr. Morton, the residuary beneficiary under the will, exercised any undue influence on Mr. Beer in connection therewith and find no evidence justifying that conclusion. He was not present at the time of its execution and his only connection therewith seemed to have been in the capacity of a messenger carrying to Mrs. Ahlf Mr. Beer's request that she draw a will for him. As hereinbefore indicated, conversations concerning the provisions of the will were thereafter carried on between Mrs. Ahlf and Mr. Beer in his room at the convalescent home with Mrs. McCarter only being present.

The decree made and entered by the court below is affirmed.