Argued February 16, affirmed April 13, petition for rehearing denied May 11, 1955

IN THE MATTER OF THE ESTATE OF SOPHIE FREDRICKS, DECEASED

## CLAUDER v. MORSER
282 P. 2d 352

*Joseph H. Page,* Portland, argued the cause for appellant.

*McDannell Brown,* Portland, argued the cause and filed a brief for respondent.

Before WARNER, Chief Justice, and LUSK, BRAND and LATOURETTE, Justices.

WARNER, C.J.

This proceeding contests the last will and testament of Sophie Fredricks. It was instituted by the decedent's brother, Joseph Clauder, against Marie E. Morser, the decedent's daughter and sole heir under her will executed June 3, 1952. From a decree sustaining the will, the brother appeals.

Sophie Fredricks was 79 years of age when she died in the Hazelwood Sanitarium in Portland, Oregon, on June 14, 1952, leaving an estate valued at approximately $5,000. She was a native of Austria and could neither read nor write, which explains why all the

instruments hereinafter referred to were executed by using a cross as her mark. Mrs. Fredricks was a widow and lived alone in Portland. Through the medium of a friend, she carried on a correspondence with her daughter Marie in Wisconsin, from whom she had been separated for many years prior to Mrs. Morser's coming to Portland in 1949.

Speaking generally, the record is one of a continuing contest between the appellant uncle and his respondent niece for Mrs. Fredricks' testamentary favor. It began with Mrs. Morser's appearance in Oregon in 1949 and ended with Mrs. Fredricks' death in 1952. This contest does not constitute a happy chapter in the history of Mrs. Fredricks' family life. Both of the potential beneficiaries cloaked their purposes in conventional forms of filial or fraternal solicitude for this aged relative. However, even so glossed with the surface manifestations of devoted disinterestedness, it is not difficult for us to discover in the voluminous record of over 500 pages that each party to this contest was in reality urged on by the high hope and expectation of being the only one favored to receive Mrs. Fredricks' entire but modest estate. Each devoted much time and thought to insure that result.

As far back as 1948 the play for advantage began and was thereafter evidenced by a shifting of titles. Before taking up permanent residence in Portland in 1949, Mrs. Morser, in response to an urgent call, came to that city the latter part of October 1948 or in the early part of November for the purpose of caring for her parent, then ill. While on that visit, she was successful in inducing her mother to convey the homeplace to her. The precise circumstances leading to this transaction are unknown. We note, however, that the deed was executed shortly after Mrs. Morser's arrival, i.e., November 15, 1948, for a recited consideration of $10

and bears no revenue stamps. It was recorded the following day. Shortly after this transaction, Mrs. Morser returned to her home in Wisconsin.

Mrs. Morser and her husband later sold their place in Milwaukee, Wisconsin, and at Mrs. Fredricks' request came back to Portland in August 1949. There they took up residence with the decedent; but about November 25 of the same year, as a result of some friction with Mrs. Fredricks, the Morsers moved elsewhere in Portland. This ill feeling between the mother and daughter apparently was the result of a complaint initiated by Mrs. Morser charging her mother with insanity. However, before a hearing was had and before the Morsers left the Fredricks home, the insanity proceeding was dismissed on the daughter's motion; but traces of the bitterness it engendered were evident for long afterward.

It was after the Morsers' departure that the contest between uncle and niece for Mrs. Fredricks' testamentary favor really began in earnest. Mrs. Fredricks' property became the shuttlecock, passing first to one and then the other in the game they were waging for its control. It was then that Joseph Clauder "moved in" and assumed the position of his sister's advisor and confidant. On December 14, 1949, only 20 days after the Morsers had moved, Clauder had his sister in the office of his attorneys where she executed a will leaving $1 to her daughter and the remainder of her estate to her brother. This is the will Clauder seeks to have probated in lieu of the contested will on June 3, 1952, which was admitted to probate on June 19, 1952. It is the claim of Clauder that his sister lacked testamentary capacity when she signed the will of June 3 and that if she executed the will at all at that time, it was by reason of and in response to the undue influence of Mrs. Morser.

Sometime after the Morsers left the Fredricks home, Mrs. Morser was induced to convey back to the decedent the property she had received by deed in November 1948. In February 1950, Mrs. Fredricks changed the beneficiary in her life insurance policy, making it payable to the contesting brother. Later, as a provision of the will of June 1952, the daughter was made beneficiary in place of Clauder.

During the latter part of October 1951, Mrs. Fredricks sold her home to a Mrs. and Mrs. Ukolow under a contract of sale upon which a down payment of $1,500 was made. The deal was negotiated for her by the contestant while Mrs. Fredricks was in a rest home. At the time of signing the contract of sale, she also conveyed the legal title to the property to her brother and assigned to him the Ukolow contract, thus enabling him to convey the property to the Ukolows when they completed payments on the contract and, in the meantime, allowing him to collect and disburse all funds received. This was done pursuant to a short agreement of trust between Clauder and his sister under which the brother was bounden to pay her expenses from the proceeds of the sale and was to retain such balance as remained at the time of her death.

The next chapter in the struggle between niece and uncle began in February 1952, not long after Mrs. Morser learned of the sale of the property to the Ukolows and of the funds in the possession of Clauder. It was then that Mrs. Morser moved for the appointment of a guardian for her mother on the ground that she was mentally incompetent. In that proceeding in the circuit court for Multnomah county, Mrs. Morser was appointed by the probate department as guardian of her mother's person and McDannell Brown, Mrs. Morser's attorney, as guardian of the mother's estate. Just what transpired in the guardianship between its

beginning in February 1952 and May 2, 1952, is not entirely clear, inasmuch as only two documents filed therein are made a part of the record here, i.e., the order and the account, hereinafter referred to. However, from the recitals in the court's order of May 2, we learn that shortly after the two guardianships were set up, Mrs. Fredricks moved the court for an order vacating those appointments. Hearings were had thereon in March 1952, which resulted in the order of May 2 dismissing the guardianship of Mrs. Fredricks' person but continuing the guardianship as to her estate on the ground that she was so infirm in body that she was unable to manage and care for her property. The order expressly found that Mrs. Fredricks was "not mentally incompetent so as to require the appointment of a guardian of her person."

In the same order the court accepted the resignation of Mr. Brown as the guardian of her estate and in lieu appointed Donald L. Alderton, an attorney retained by Clauder. It was Mr. Alderton who had drawn the instruments in connection with the Fredricks-Ukolow deal, above referred to, the order of the court in the guardianship matter and the account of Joseph Clauder, Trustee, to which we hereafter refer.

What were the negotiations, if any, which led to the withdrawal of Mr. Brown in the guardianship matter and the substitution on May 2 of Mr. Alderton is not revealed, nor is it shown why Clauder apparently voluntarily reconveyed to Mrs. Fredricks title to the homeplace and reassigned to her the Ukolow contract, all as of April 28, 1952, when under the trust agreement he had a valuable interest therein, maturing in his favor on her death. Nor do we know why Clauder felt bound to account at that time to the guardianship for the money he had received under the Ukolow contract, less the disbursements made therefrom. This account

shows $687.39 "in the hands of Joseph Clauder, Trustee" and $195 "in Trust account of D. L. Alderton, attorney at law"—a total of $882.39 belonging to Mrs. Fredricks if the trust had no vitality. The account was signed and verified *May 20, 1952,* but not filed in the guardianship matter until *July 3, 1952,* approximately 20 days after Mrs. Fredricks' death and nearly two weeks after Mrs. Morser's appointment as executrix.

Here ends the documentary history of the seesaw struggle between Mrs. Fredricks' only child and Mrs. Fredricks' brother for dominion over her meager resources.

In summary of the events during the period before Mrs. Fredricks' death, it appears that although decedent's property passed out of her legal reach and control during most of that time, shortly before her demise she was reinvested with that which was properly hers; that she apparently was never in want by reason of the machinations of her relatives and enjoyed for her use and benefit the avails of such property as she had before the Morser-Clauder contest began. No charge is made that any funds or property belonging to Mrs. Fredricks had been dissipated or mismanaged by the party then in possession, except as to an item of $28 said by Clauder to have been received by Mrs. Morser from the sale of some of Mrs. Fredricks' furniture.

Moreover, during the same period Mrs. Fredricks' mentality had had two vindications. As previously noted, the insanity proceeding instituted in late 1949 had been dismissed on the motion of the party filing the petition for a hearing. More noteworthy is the fact that in the guardianship proceeding started in February 1952, the probate court, after a contested hearing, found that she was "not mentally incompetent so as to require the appointment of a guardian of her person."

This was on May 2, 1952, *one month before the decedent executed the will here litigated.*

We have probably unduly labored this opinion with a recital of the foregoing transactions occurring between the time Mr. and Mrs. Morser left the Fredricks home in November 1949 and the time the decedent executed the will of June 3, 1952. We have done so because much of the parties' time, testimony and briefs was addressed to that period. Notwithstanding the evidence, we attach little or no importance to that part of the record, when it is examined in terms of the settled law applicable to the solution of the very few issues here present.

At best, the happenings prior to the execution of decedent's last will do not rise much higher than a recital of the activities of two avaricious persons sparring for a position of advantage which would secure for them the ultimate ownership of Mrs. Fredricks' property; and they are of little help to us in our conclusions here.

The second, last and most important phase of this matter has its setting in Hazelwood Sanitarium where Mrs. Fredricks went on April 28, 1952, as a patient suffering from malnutrition and where she remained until she died on June 14, 1952. However, the point of greatest interest falls within a few days before and including the day she signed the will in contest.

This appeal presents no novel legal problem. The applicable law has long been well settled in this jurisdiction. Even the facts have a most familiar ring, particularly the account of the circumstances under which the will came into being while Mrs. Fredricks was in the hospital. See *In re Estate of Andersen,* 192 Or 441, 235 P2d 869.

The ultimate question to be determined is

whether or not Mrs. Fredericks had testamentary capacity *at the time she executed the will.* It is the condition of decedent's mind at the precise moment she executed that instrument which is the determining factor in testing testamentry capacity. *In re Estate of Verd Hill,* 198 Or 307, 318, 256 P2d 735; *In re Estate of Beer,* 190 Or 15, 22, 222 P2d 1005; *In re Christofferson's Estate,* 183 Or 75, 84, 190 P2d 928. In meeting the burden of proof which is cast upon proponents to prove testamentary capacity, they have the benefit of the presumption of a testator's competency (*In re Estate of Verd Hill,* supra), a presumption which is enhanced when, as here, the will was executed in due form. *In re Estate of Beer,* supra.

■ The testimony of the subscribing witnesses, aided by the presumption of sanity which follows proof of due execution, carries great weight in determining the decedent's capacity at the time of executing a will. *In re Estate of Verd Hill,* supra, at p. 324; *In re Estate of Beer,* supra, at p. 24; *In re Christofferson's Estate,* supra, at p. 84; *In re Walther's Estate,* 177 Or 382, 401, 163 P2d 285. The foregoing rule is so well settled in this jurisdiction that the testimony of lay persons who were subscribing witnesses to a will's execution has occasionally been given greater evidentiary value on the question of a testator's competency than has evidence to the contrary then given by doctors and nurses in attendance on the testator immediately before or immediately after the execution of the challenged document. See *In re Estate of Andersen,* supra, where the court said, at p. 453:

"* * * The evidence of the physicians and of the nurses as to her physical and mental condition before and after the time of the execution of the will was entirely competent in this connection. In re Murray's Estate, 173 Or. 209, 220, 144 P. 2d

1016; In re Provolt's Estate, 175 Or. 128, 133, 151 P. 2d 736. As against such opinion evidence, however, we have the unqualified statements of unimpeached witnesses of the existence of the facts evidencing testamentary capacity. * * *"

The reason for according great weight to the testimony of subscribing witnesses is stated in *Tromley et al. v. McKenney, Ex., et al.*, 191 Or 90, 107, 228 P2d 417:

"* * * Inasmuch as the vital question to determine is that of competency at the very time the will is executed, testimony of persons who had occasion to observe the testator at or near that time is of much greater weight than that of other persons testifying to times and occasions more remote. * * *"

It is the opportunity to observe and hear by reason of the usual proximity of a subscribing witness to the testator during the period of the testamentary execution and not his legal capacity as such a witness that gives his testimony the quality of weight usually granted it. There can be, and not infrequently are, other disinterested persons who are also present at the moment of the will's execution who had an equal or a better opportunity to hear and observe the testator during the important moment of the will's signing and whose testimony may, by reason thereof, attain equal, if not greater, weight than the parties who appended their names as witnesses to the will's execution. The relative importance and weight of the testimony of parties present at the signing of a will depends upon the facts and circumstances peculiar to each case.

Likewise, the legal tests for the determination of testamentary capacity are established with equal certainty. In *In re Estate of Verd Hill,* supra, at p. 317,

the summary taken from *Re Phillips' Will,* 107 Or 612, 618, 213 P 627, is repeated and applied. It is:

"* * * (1) that at the time of making the will, the testator comprehends the nature of the act in which he is then engaged; (2) that he knows the nature and extent of the property which makes up his estate and concerning which he intends to make testamentary disposition; (3) that he has in mind the persons who are, should or might be the objects of his bounty; and (4) that he is cognizant of the scope and reach of the provisions of the instrument."

When we test the record here in terms of these rules, we find that Mrs. Fredricks had the necessary testamentary capacity to execute the will which she did on June 3, 1952.

Mrs. Fredricks comprehended the nature of the act in which she was engaged. The instrument was drawn as a result of her repeated insistence. It was she who requested the nurses to act as witnesses, even before the document was presented and executed. Her repeated assertions made before and during the day she signed it leave no doubt that she knew not only the nature and extent of her property but was desirous that Mrs. Morser, her daughter and only heir, should receive her entire estate. In making the foregoing conclusions, we depend entirely upon the testimony of the two disinterested nurses who served Mrs. Fredricks at the hospital and acted as witnesses to the will's execution.

Mrs. Adams was the superintendent of the hospital and a registered nurse with many years of experience. Mrs. Equals, the other witness, was a practical nurse with several years of training. Both had assisted in the care of Mrs. Fredricks during the entire time she was in the hospital. It was the considered judgment of these women that Mrs. Fredricks at the time the

will was signed was "in her right mind", "had her own faculties"; "her mind was clear"; she was "mentally competent" and knew "what she wanted". It is from them we also learn that the testatrix' mental condition was good for about a week before she died, or about ten days after the will was signed. The testimony of the nurses as to what transpired at the time of the execution of the instrument went without contradiction.

The will was read to the testatrix twice, once by her daughter while waiting for the coming of the nurses who were to act as witnesses, and again by Mrs. Adams, the superintendent, before its execution. After these readings Mrs. Fredricks expressed her understanding and approval of the will. In this precedure the circumstances parallel to a large degree a like situation reported in *In re Estate of Andersen,* supra, 192 Or 453, where we noted our approval in these words: "Such method of proof was very proper in view of the testatrix's age and infirm condition. *Pickett's Will,* supra [49 Or 127, 89 P 377], at p. 141."

While we have repeatedly frowned upon wills drawn by attorneys for a beneficiary enjoying confidential relations with the testator, as did Mrs. Morser in this matter, and have held that such conduct gives rise to a presumption of undue influence (*In re Estate of Manillus Day,* 198 Or 518, 532, 257 P2d 609; *In re Lobb's Will,* 177 Or 162, 188, 160 P2d 295), we feel that in this matter the presumption is overcome by the following circumstances: (1) the beneficiary is the sole heir of the decedent and would have taken the entire estate in the absence of a will; (2) the drawing of the will was done at Mrs. Fredricks' repeated and urgent request addressed to Mrs. Morser; and (3) Mrs. Morser first attempted to reach Mr. Alderton, who had recently acted as counsel for Mrs. Fredricks. She advised him of her mother's desire to consult with him

but found that he could not call upon Mrs. Fredricks because of a contemplated absence from the city. Mrs. Morser then sought the help of Mr. Brown, her own attorney, but only to learn that he was out of town for two weeks.

In response to Mrs. Fredricks' continued insistence, Mrs. Morser turned to her neighbors and friends for help—Mr. and Mrs. Grabb, the former a business man and his wife a former employee for many years in a title company. On a printed form supplied by Mrs. Morser, the Grabbs composed and typed the document which Mrs. Fredricks eventually signed. The pattern of disposition embodied in the will was that which Mrs. Fredricks had previously indicated to the nurses as being what she wanted and was the same pattern she again approved after it was read to her before signing.

Notwithstanding what we have heretofore said concerning the presumptions raised by the activities of a potential beneficiary in securing an attorney of his own selection to prepare an instrument of this kind on the basis of information allegedly supplied to the beneficiary by the testator, we do not mean thereby to convey the impression that we condemn such activity in every instance. It is easy to conceive situations demanding immediate attention wherein it would be palpably unjust to impugn the motives of a beneficiary who, in an atmosphere of urgency, thus served the testator in good faith and at the testator's pressing request. The circumstances attending the preparation of Mrs. Fredricks' will exemplify such an exonerating exception.

The court said at p. 344 of *In re Estate of Verd Hill*, supra:

"The malignant influence contemplated as being of sufficient force to invalidate a will is that which was the efficient cause of the challenged benefaction

and without which the will would never have been made. In re Lobb's Will, 177 Or 162, 185, 160 P2d 295. We have held that motive and opportunity are not enough. More is required. There must be proof that undue influence was actually exercised. In re Estate of Andersen, supra, 192 Or 461; In re Will of Robert Carr, supra, 121 Or [574,] 581, [256 P 390].''

Moreover, such offending influence must operate at the very time the will is executed. *In re Estate of Verd Hill,* supra, at p. 345. We find no proof that such undue influence existed or was actually exercised.

The appellant indicts the nurses in terms not warranted by the record. He asks us to believe that ''they were clearly hostile, unreliable and deliberately false.'' This we cannot do. We confess that certain parts of Mrs. Morser's testimony were not always convincing and at times cast doubts upon its verity. Yet, we are not prepared to evaluate Mrs. Morser as does the appellant when he says she ''testified falsely and knowingly so'' about certain instances. However, even if we join with the appellant in his characterization of Mrs. Morser's testimony, we find that when we delete from our consideration those areas of doubt, our ultimate holding must still be the same.

■ There is yet a better and more persuasive reason for accepting the criticized testimony at full value. Any doubt concerning the testimony of the nurses or Mrs. Morser should be resolved in favor of the conclusions reached by the trial judge in a case of this character. In matters wherein domestic and family relationships are involved, particularly when and where bitterness is engendered between kinsmen over the final disposition of an estate in the family, we feel that the findings of the trial judge, especially one so rich in judicial experience in litigation of this kind as was the trial judge here, the late Judge Combs, attain an unusually

persuasive quality. The cogency of and reasons for such a conclusion were set out by Mr. Justice Jackson when he said in *United States v. Oregon Med. Soc.,* 343 US 326, 339, 96 L ed 978, 72 S Ct 690:

> "As was aptly stated by the New York Court of Appeals, although in a case of a rather different substantive nature: 'Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth. . . . How can we say the judge is wrong? We never saw the witnesses. . . . To the sophistication and sagacity of the trial judge the law confides the duty of appraisal.' Boyd v. Boyd, 252 N.Y. 422, 429, 169 N.E. 632, 634."

Affirmed, with costs to neither party.